HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| SEAN WILSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>HUUUGE, Inc., a Delaware corporation,<br><br>Defendant. | CASE NO. 3:18-cv-05276-RBL<br><br>ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION<br><br>DKT. #31 |

## INTRODUCTION

THIS MATTER is before the Court on Defendant Huuuge, Inc.'s Motion to Compel Arbitration. Dkt. #31. The underlying dispute is a class action to recover money lost playing electronic gambling games available through a mobile app. Huuuge's Terms of Use, which include an arbitration provision, are made available when a user initially downloads the app and in the menu of the game itself.

Huuuge argues that the configuration of its app page and settings menu put a reasonable user on inquiry notice that playing Huuuge Casino entails agreeing to the Terms of Use. Wilson responds that he is not bound by Huuuge's Terms because the notice and URL were not sufficiently conspicuous.

ORDER DENYING DEFENDANT'S MOTION TO
COMPEL ARBITRATION - 1

## BACKGROUND

Plaintiff filed this Complaint against Huuuge on April 6, 2018, alleging that Huuuge Casino constitutes illegal gambling in violation of RCW § 4.24.070. Dkt. #1, at 11-13. Huuuge Casino is a game available as a mobile app and allows users to play gambling games with virtual "chips" that may be purchased in the app after users run out of the initial free allotment. *Id*. at 6-7. Despite the fact that these chips cannot be redeemed for actual money, Wilson alleges that they are nonetheless valuable because they can be used to continue playing. *Id.* at 12-13. Therefore, Wilson alleges that Huuuge's game amounts to gambling as defined by statute and that he is entitled to recover the money he lost playing. *Id.* at 13.

Wilson downloaded Huuuge Casino from the Apple App Store. Motion, Dkt. #31, at 2. When a user searches for the Huuuge Casino app, they first encounter a list of apps that match their search query. Dkt. #37, Ex. A (video of user searching for, downloading, and playing Huuuge Casino). Each item on the list contains the name of the app, the developer, the app's user rating, a large picture showing the gameplay experience, and a blue "GET" button on the right that initiates downloading. *Id*. If a user wants to learn more about the app before downloading it, they can click to visit the app's page, which includes more information and another place to download. *Id*. At the bottom of the app page, a user can click an icon that says "more," which reveals details about the game. *Id*. After scrolling through several screens' worth of text, a user eventually encounters the statement "Read our Terms of Use," followed by a URL that a user can copy and paste into their web browser to access the Terms. Opp'n, Dkt. #35, at 6-9. The following images depict the app page when a user first visits it, after clicking the "more" icon, and finally after scrolling down to the Terms of Use. *Id*.



Once a user downloads the game, they can view another link to the Terms of Use by visiting the settings menu. Motion, Dkt. #31, at 4. This menu is accessible via a button in the upper corner of the game screen. Opp'n, Dkt. #35, at 13. The game screen and settings menu are depicted below. Dkt. #31, at 4; Dkt. #35, at 13.





**DISCUSSION**

1. **Legal Standard**

The Federal Arbitration Act provides for the enforceability of valid arbitration agreements and "permits a party 'aggrieved by the alleged ... refusal of another to arbitrate' to petition any federal district court for an order compelling arbitration in the manner provided for in the agreement." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting 9 U.S.C. § 4). A court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Id.* (citation omitted).

However, a court may "submit to arbitration only those disputes . . . that the parties have agreed to submit." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (internal quotations omitted). Determining whether parties have agreed to submit to arbitration requires applying "general state-law principles of contract interpretation." *Id.* (quoting *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir.2009)). "If the parties contest the existence of an arbitration agreement, the presumption in favor of arbitrability does not apply," *id.*, and the burden of proving the existence of an agreement rests with the party trying to compel

arbitration. *Norcia v. Samsung Telecomms. America*, LLC, 845 F.3d 1279, 1283 (9th Cir. 2017). In addition, such formation issues are decided by a district court, not an arbitrator. *Sanford v. Memberworks, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007).

**2.    Formation of an Agreement to Arbitrate**

Whether or not this dispute falls within the scope of the arbitration provision in Huuuge's Terms of Use, Huuuge cannot compel arbitration if Wilson never agreed to be bound by those Terms. When a user visits a website or downloads an app, they may be bound by the accompanying terms either through a "clickwrap" agreement or a "browsewrap" agreement. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014). While clickwrap agreements involve presenting the user with a list of terms and a button to manifest assent, browsewrap agreements present the user with just a hyperlink to the terms of use and do not necessarily require clicking a specific button to manifest assent. *Id*. Several courts have observed that the law of other jurisdictions is similar to Washington law on this topic. *See, e.g., Domain Name Comm'n Ltd. v. DomainTools, LLC*, No. C18-0874RSL, 2018 WL 4353266, at *3 (W.D. Wash. Sept. 12, 2018) (applying Washington law in a case involving browsewrap and relying on Ninth and Second Circuit cases applying the law of other states); *Spam Arrest, LLC v. Replacements, Ltd.*, No. C12-481RAJ, 2013 WL 12108077, at *7 n.10 (W.D. Wash. Aug. 20, 2013) (observing that Washington law does not differ greatly from the law of other states with respect to online contracts).

The Ninth Circuit has stated that "the validity of [a] browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d at 1176 (quoting *Van Tassell v. United Mktg. Grp., LLC*, 795 F.Supp.2d 770, 790 (N.D.Ill.2011)). "Courts have consistently enforced browsewrap

agreements where the user had actual notice of the agreement." *Id*. However, where this is not the case, whether a website would put a reasonably prudent user on inquiry notice of its terms "depends on the design and content of the website and the agreement's webpage." *Id*. at 1177. Courts should distinguish between cases where the terms of use are "buried at the bottom of the page or tucked away in obscure corners of the website" and cases "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *Id*. Ultimately, "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement." *Id*.

In *Nguyen*, the Ninth Circuit held that a browsewrap agreement was not formed despite the fact that the hyperlinks to the website's terms of use were either visible without scrolling or located so close to the "checkout" button that a user would necessarily see them. *Id*. at 1178. The court distinguished *PDC Labs., Inc. v. Hach Co.*, where the website's hyperlinks were similarly conspicuous but users were also prompted to "review terms" before placing their final order. *Id*. (quoting No. 09–1110, 2009 WL 2605270 (C.D.Ill. Aug. 25, 2009)). The court held that websites containing conspicuous hyperlinks but that "provide[] no notice to users nor prompt[] them to take any affirmative action to demonstrate assent" do not give inquiry notice. *Id*. at 1179; *see also McKee v. Audible, Inc.*, No. CV 17-1941-GW(EX), 2017 WL 4685039, at *8 (C.D. Cal. July 17, 2017) (finding no inquiry notice where the website's notification stated that "completing your purchase" would bind the user to the terms, but did not state that clicking the "start now" button to begin a free trial would carry this consequence).

In contrast, in *Meyer v. Uber Technologies, Inc.*, the Second Circuit held that a browsewrap agreement was formed where the notification and hyperlink regarding terms of use

were "spatially . . . [and] temporally coupled" with the mechanism for manifesting assent. 868 F.3d 66, 78 (2d Cir. 2017). As the court described, "The Payment Screen [was] uncluttered, with only fields for the user to enter his or her credit card details, buttons to register for a user account . . . , and the warning that 'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY.'" *Id*. The court held that a reasonable consumer would understand that this configuration "connect[ed] the contractual terms to the services to which they appl[ied]." *Id*.

Courts have also recognized that the labels of "clickwrap" and "browsewrap" do not encompass every type of online consumer contract. The defining features that makes clickwrap agreements regularly valid are the forced confrontation with the terms and the forced decision to accept or reject them by clicking a button. *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 838 (S.D.N.Y. 2012) (citing *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 377 (S.D.N.Y. 2010)). However, even if a website or app contains just a hyperlink to the terms, courts have been more willing to find a valid agreement if the user is still forced to somehow manifest their assent to the terms, as opposed to passively browsing the site. *See, e.g.*, *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 236 (2d Cir. 2016) (recognizing that there is a "hybrid between a clickwrap and browsewrap agreement"); *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 990 (N.D. Cal. 2017); *Cullinane v. Uber Techs., Inc.*, No. CV 14–14750–DPW, 2016 WL 3751652, at *8 (D. Mass. July 11, 2016). The key questions in such situations is whether the website or app adequately informs a reasonable user that by clicking a certain button they are also agreeing to be bound by the terms. *Nicosia*, 834 F.3d at 236.

Because actual knowledge is not at issue here,[1] the question is whether Wilson was on inquiry notice of Huuuge's Terms of Use. Huuuge contends that its app page presents a "hybrid"

---

[1] Although Huuuge suggests in its Reply that Wilson was "likely" to have viewed the Terms at some point because he played the game many times, Huuuge does not present any evidence of Wilson's actual knowledge. Reply, Dkt.

situation where inquiry notice is more likely, but this is incorrect. Although a user does have to click the "GET" button to download Huuuge Casino, there is no accompanying notification informing a user that the "GET" button doubles as a manifestation of assent to Huuuge's Terms. Unlike *Fteja*, where the website informed users that "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service," the notification on Huuuge's app page merely states, "Read our Terms of Use." *See* 841 F. Supp. 2d at 835; *see also Starke v. Gilt Groupe, Inc.*, No. 13 CIV. 5497 LLS, 2014 WL 1652225, at *1, *3 (S.D.N.Y. Apr. 24, 2014) ("When Starke clicked 'Shop Now,' he was informed that by doing so, and giving his email address, 'you agree to the Terms of Membership for all Gilt Groupe sites.'"). Despite this shortcoming, Huuuge's notification would likely be sufficient if it were actually next to the button a user must click to download the app. *See Nguyen*, 763 F.3d at 1178 (distinguishing *PDC Labs., Inc. v. Hach Co.*, No. 09-1110, 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009) for its admonition that users should "Review terms"). However, this is far from the case. To view the notification and URL, a user must click an icon that says "more" and scroll past a lengthy description of the game's many features before encountering a few brief lines of text regarding terms. *See Rushing v. Viacom Inc.*, No. 17-CV-04492-JD, 2018 WL 4998139, at *2 (N.D. Cal. Oct. 15, 2018) (holding that a browsewrap agreement was invalid where a user had to click "more" on the app page in order to view the notice regarding terms of use).

    Beyond this fatal inadequacy, there are other problems with the configuration of Huuuge Casino's app page. Perhaps most importantly, a user can download the app before ever even visiting the full app page because the "GET" button also shows up next to each app listed in the

---

#39, at 6. Given that the party seeking to compel arbitration bears the burden of proving that a contract was formed, this sort of speculation is not enough to prove actual knowledge.

search results. In addition, the notification to "Read our Terms of Use" and the following URL are in generic black font and blend into the surrounding text such that a user would have no reason to notice them unless they were specifically hunting for them. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 404 (E.D.N.Y. 2015) (holding that an agreement was invalid where "[t]he hyperlink to the 'terms of use' was not in large font, all caps, or in bold"). All of this results in Huuuge's app page failing to put a reasonable user on inquiry notice of the Terms of Use.

The in-game link to the Terms of Use is no better. Although the link to "Terms and Policy" is prominent enough within the settings menu, a user must first click a small box with three dots in the upper corner of the game screen to bring that menu up at all. While some users may have a desire to edit their profile or alter the sound settings, visiting this menu is not essential or even helpful for playing the game. Furthermore, if a user did happen to visit the settings menu, *Nguyen* held that even a prominent hyperlink to a website's terms is insufficient to put a user on inquiry notice without some additional notification. *See* 763 F.3d at 1178. Here, the settings menu contains no such notification, so any increased likelihood of Wilson visiting the settings menu due to repeated use of the app is irrelevant.

Nonetheless, Huuuge insists that, because Wilson played their game many times, insufficient notice is somehow made sufficient through shear repetition. Huuuge bases this theory primarily on the reasoning from *Register.com, Inc. v. Verio, Inc.* and *Cairo, Inc. v. Crossmedia Services, Inc.* In *Register.com*, a user was charged with actual knowledge of website terms because, after each automated search on the website, they received the terms attached to each response. 356 F.3d 393, 396-97, 401-02 (2d Cir. 2004). Crucially, the user admitted to being "fully aware of the terms." *Id*. at 402. The user in *Cairo* also engaged in automated searching of the defendant's web pages, each of which included a prominent notification upon

entry that using the site required agreeing to its terms. No. C 04-04825 JW, 2005 WL 756610, at *2 (N.D. Cal. Apr. 1, 2005). In addition to the user admitting to actual knowledge, the court held that the "repeated and automated use" of the web pages meant that knowledge of the terms could be imputed. *Id*. at *5.

The holdings in *Register.com* and *Cairo* are simply inapplicable in a case like this where there is no actual knowledge or prominent notification. *Register.com* rested on the user's admission of actual knowledge, but Wilson does not make such an admission. To the extent that the reference to "imputing knowledge" in *Cairo* may be compared to putting a user on inquiry notice, the website in *Cairo* contained an "explicit textual notice" that informed users that they would be bound by the terms. *See Nguyen*, 763 F.3d at 1177 (distinguishing *Cairo*). Consequently, where courts have emphasized the user's repeated use of the site, it has been because the site had a prominent notification that was either unavailable on the initial search (making repeated use necessary for notice) or not viewed by an actual human. *See Register.com*, 356 F.3d at 401; *Cairo*, 2005 WL 756610, at *2-3; *Domain Name Comm'n Ltd. v. DomainTools, LLC*, No. C18-0874RSL, 2018 WL 4353266, at *4 (W.D. Wash. Sept. 12, 2018) ("It is not until information is returned in response to a query that the TOU are presented."). None of these elements are present here.

Instead, Huuuge repeatedly conflates the consistent availability of the Terms of Use with actual or constructive knowledge of them. *See* Motion, DKt. #31, at 15. However, a hyperlink may be tucked away in a corner of a website or buried beneath a mountain of text and still be theoretically "available" to a user. [2] While repeatedly playing a game may make it more likely

---

[2] Huuuge is fond of the fruit stand metaphor employed in *Register.com*, and attempts to apply it to this situation. Reply, Dkt. #39, at 11-12. In *Register.com*, the court explained that if a customer at a fruit stand saw a sign reading "Apples – 50 cents apiece" as he exited the stand with a half-eaten apple, he could not claim to be unbound by those terms in future dealings with the stand. 356 F.3d at 401. However, if the sign was not clearly visible upon exiting but

that at some point the "Terms of Use" hyperlink will cross a user's field of vision, *Nguyen* specifically held that this is not enough for inquiry notice. *See* 763 F.3d at 1178-79. Furthermore, after moving beyond the initial download, a user actually becomes *less* alert to binding contractual terms while casually using the product. *See Meyer*, 868 F.3d at 78. It would be a different story, perhaps, if the terms popped up each time a user fired up the game or when they registered their account, but that is not the story here. *See id*.

Having failed to prove that its app can measure up to the standard set by other browsewrap cases, Huuuge argues in its Reply that "[t]he Court should take judicial notice of ubiquitous online agreements when weighing the objective standard for reasonable prudence and inquiry notice." Dkt. #39, at 4. In essence, Huuuge would like the Court to ignore all of the cases rejecting inconspicuous browsewrap and apply a blanket presumption that users these days just *assume* that every app they download is riddled with binding terms and provisions, many of which remove or limit important rights, and it is their duty to ferret out these terms wherever they may be. According to Huuuge, such an approach would avoid "repercussions to the commercial paradigm that technology companies and consumers have embraced in an app-driven world." *Id*. at 5.

The Court declines to adopt Huuuge's suggestion. While online users today are savvier than in the past, this does not mean that the rules of contract law no longer apply. If an app developer wishes to bind a user to their copious terms, the onus is on the developer to at least provide reasonable notice and easy access. This is not a difficult thing to do when designing an app, despite Huuuge's protestations that the Court should devise some special rule for app store

---

was instead on the far end of the stand and read "see reverse side for details about these apple," the customer would not be bound.

purchases. *See Meyer*, 868 F.3d at 77 (holding that the Uber app formed a valid agreement under browsewrap case law); *see also Rushing*, 2018 WL 4998139, at *1 (observing that there is nothing wrong with binding a user to terms upon downloading an app, but requiring sufficient notice to do so). The fact is, Huuuge chose to make its Terms non-invasive so that users could charge ahead to play their game. Now, they must live with the consequences of that decision.

## CONCLUSION

For the reasons stated above, Huuuge's Motion to Compel Arbitration (Dkt. #31) is **DENIED**.

IT IS SO ORDERED.

Dated this 13th day of November, 2018.

Ronald B. Leighton
United States District Judge