The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

SEAN WILSON, individually and on behalf of all others similarly situated,

       *Plaintiff,*

    *v.*

HUUUGE, INC., a Delaware corporation,

       *Defendant.*

No. 18-cv-5276-RSL

**PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT**

Noting Date: January 15, 2021

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    I.    Class Counsel's 2015 Social Casino Lawsuits. ............................................ 3

    II.   Class Counsel Appeals The Kater Dismissal And The Ninth Circuit Reverses. ........ 4

    III.  Class Counsel's Post-Appeal Litigation Conduct Before This Court. .......... 5

    IV.  Class Counsel's Litigation-Adjacent Efforts On Behalf Of the Class. ......... 7

    V.   The Settlement Now Before The Court. ........................................................ 10

THE TERMS OF THE SETTLEMENT AGREEMENT ............................................. 11

        A.   Settlement Class Definition ................................................................. 11

        B.   Monetary Benefits ................................................................................ 11

        C.   Prospective Relief ................................................................................ 12

        D.   Release .................................................................................................. 13

        E.   Attorneys' Fees and Expense Requests & Incentive Award Requests ............. 13

ARGUMENT ................................................................................................................ 13

    I.    The Court Need Not Revisit Class Certification. ........................................ 13

    II.   Notice Was Successful And Satisfied Due Process. ................................... 13

    III.  The Court Should Finally Approve The Settlement. ................................... 17

        A.   Class Counsel and the Class Representatives have adequately represented the Class and support the Settlement. ................................... 17

        B.   The Settlement was negotiated at arm's length. ................................. 18

        C.   The amount offered in Settlement is adequate, taking into account the strength of Plaintiff's case, and the risks inherent in further litigation. ..... 20

            i.    The Settlement Class would have faced significant delay before it could have recovered anything on the merits. ............... 20

ii.    Given the risks involved with further litigation, the amount offered in Settlement is outstanding.................................................. 22

D.    The Settlement Treats Settlement Class Members Equitably........................... 24

E.    Class Counsel Had Sufficient Information To Reach An Informed Judgement About The Benefits Of Settling, And The Quality Of The Settlement.................................................................................................................... 26

F.    The Reaction Of The Settlement Class Has Been Favorable............................ 26

CONCLUSION................................................................................................................... 27

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

# <u>TABLE OF AUTHORITIES</u>

**United States Supreme Court Cases**

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ..................................................................................... 13

*Frank v. Gaos*,
    139 S. Ct. 1041 (2019) ............................................................................ 2, 23

**United States Circuit Court of Appeals Cases**

*Churchill Vill., L.L.C. v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ................................................................ 17, 27

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ..................................................................... 13

*In re Bluetooth Headset Prod. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ........................................................... 17, 18, 19

*In re Equity Funding Corp. of Am. Securities Litig.*,
    603 F.2d 1353 (9th Cir. 1979) ..................................................................... 25

*In re Google Referrer Header Privacy Litig.*,
    869 F.3d 737 (9th Cir. 2017) .................................................................. 2, 23

*Juris v. Inamed Corp.*,
    685 F.3d 1294 (11th Cir. 2012) ................................................................... 13

*Kater v. Churchill Downs Inc.*,
    886 F.3d 784 (9th Cir. 2018) .................................................................. 4, 20

*Mason v. Mach. Zone, Inc.*,
    851 F.3d 315 (4th Cir. 2017) ......................................................................... 4

*Mullins v Direct Digital LLC*,
    795 F.3d 654 (7th Cir. 2015) ....................................................................... 13

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ........................................................... 19, 21, 27

*Wilson v. Huuuge, Inc.*,
    944 F.3d 1212 (9th Cir. 2019) ............................................................ 5, 6, 18

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

**United States District Court Cases**

*Aikens v. Panatte, LLC*,
   No. 2:17-cv-01519 (W.D. Wash. Feb 5, 2019) ................................................................ 13

*Bayat v. Bank of the West*,
   No. 13-cv-2376, 2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) ..................................... 20

*Benson v. DoubleDown*,
   No. 18-cv-525 (W.D. Wash. June 17, 2020) ................................................................... 20

*Clemans v. New Werner Co.*,
   No. 12-cv-5186, 2013 WL 12108739 (W.D. Wash. Nov. 22, 2013) ............................... 27

*Dupee v. Playtika Santa Monica, et al.*,
   No. 15-cv-01021 (N.D. Ohio) ...................................................................................... 3, 4

*Gragg v. Orange CAB Co., Inc.*,
   No. 12-cv-0576 RSL, 2017 WL 785170 (W.D. Wash. Mar. 1, 2017) ............................ 19

*Helde v. Knight Transportation, Inc.*,
   No. 2:12-cv-00904 RSL (W.D. Wash. May 24, 2017) .................................................... 19

*Ikuseghan v. Multicare Health Sys.*,
   No. 3:14-cv-05539 BHS, 2016 WL 3976569 (W.D. Wash. July 25, 2016) ............... 21, 26

*In re Anthem, Inc. Data Breach Litig.*,
   327 F.R.D. 299 (N.D. Cal. 2018) ................................................................................... 23

*In re Apple In-App Purchase Litigation*,
   No. 5:11-cv-01758 EJD, 2013 WL 1856713 (N.D. Cal. May 2, 2013) ....................... 2, 22

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008)......................................................................... 18

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
   No. 16-md-02752-LHK, 2020 WL 4212811 (N.D. Cal. July 22, 2020) .......................... 23

*Kater v. Churchill Downs Inc.*,
   No. 15-cv-612 (W.D. Wash.) .................................................................................*passim*

*Kim v. Tinder, Inc.*,
   No. 18-cv-3093-JFW(ASX), 2019 WL 2576367 (C.D. Cal. June 19, 2019) ................... 22

*Mason v. Mach. Zone, Inc.*,
   No. 15-cv-01107 (D. Md. Apr. 17, 2015) ......................................................................... 3

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

*Pelletz v. Weyerhouser Corp.*,
    255 F.R.D. 537, 543-44 (W.D. Wash. 2009)....................................................................27

*Phillips v. Double Down Interactive LLC*,
    No. 15-cv-04301 (N.D. Ill.)..............................................................................................4

*Rinky Dink, Inc. v. World Bus. Lenders, LLC*,
    No. 14-cv-0268, 2016 WL 4052588 (W.D. Wash. Feb. 3, 2016) ....................................26

*Ristic v. Mach. Zone, Inc.*,
    No. 15-cv-08996 (N.D. Ill.)..............................................................................................4

*Schneider v. Wilcox Farms, Inc.*,
    No. 07-cv-01160-JLR, 2009 WL 10726662 (W.D. Wash. Jan. 12, 2009)........................26

*Walters v. Target Corp.*,
    No. 16-cv-1678, 2020 WL 6277436 (S.D. Cal. Oct. 26, 2020) ......................................17

*Wilson v. Huuuge, Inc.*,
    351 F. Supp. 3d 1308 (W.D. Wash. 2018) ........................................................................5

**Miscellaneous Authority**

2 MCLAUGHLIN ON CLASS ACTION
    § 6.23 (17th ed. 2020)....................................................................................................25

Cyrus Farivar, *Addicted to losing: How casino-like apps have drained people of millions*,
    NBC NEWS (Sept. 14, 2020), *available at* https://nbcnews.to/39Lo1X1 .........................10

Dean Takahashi, *13 predictions for the future of the $3.4B social casino games market*,
    GAMESBEAT (Oct. 19, 2015), *available at* https://bit.ly/2W83Yu3 ....................................2

Federal Judicial Center, *Judges' Class Action Notice & Claims Process Checklist & Plain Language Guide*,
    https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf. .......................................13, 14

Fed. R. Civ. P. 23 ..................................................................................................*passim*

*Harpooned by Facebook*, REVEAL (Aug. 3, 2019),
    https://bit.ly/39NIdri ....................................................................................................10

H.B. 2041, 66th Leg., Reg Sess. (Wash. 2019).........................................................................8, 9

H.B. 2720, 66th Leg., Reg. Sess. (Wash. 2020)..................................................................8, 9, 21

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

Melissa Santos, *'Free' casino apps prey on addiction, users say, and WA lawmakers are considering a crackdown*, CROSSCUT (Feb. 7, 2020), *available at* https://bit.ly/3hfFxDl......................................................................................................................10

Nate Halverson, *How social casinos leverage Facebook user data to target vulnerable gamblers*, PBS NEWSHOUR (Aug. 13, 2019), *available at* https://to.pbs.org/3lPRd1m ...10

Phillip Conneller, *Washington State Social Gaming Legislation Could Rescue Big Fish Casino From Legal Trouble*, CASINO.ORG (Jan. 29, 2020), *available at* https://bit.ly/39dKtWM. ........................................................................................8

S.B. 5886, 66th Leg., Reg. Sess. (Wash. 2019).........................................................8, 9

S.B. 6568, 66th Leg., Reg. Sess. (Wash. 2020).........................................................8, 9

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

**INTRODUCTION**

In 2018, on the heels of Class Counsel's appellate victory in *Kater*, Sean Wilson initiated this lawsuit alleging that Huuuge's social casinos are illegal gambling under Washington law. Since that time, Plaintiff and his counsel have vigorously litigated this case before this Court, the Ninth Circuit, the Washington State Gambling Commission, and even the Washington Legislature. After a full-day mediation with the Honorable Layn R. Phillips (ret.), Plaintiff and Huuuge reached a class settlement, the hallmark of which is the establishment of a non-reversionary $6.5 million common fund. At that level of recovery, every Class Member who has ever lost money playing Huuuge's social casino games is entitled to a recovery and those with higher levels of losses are entitled to recover increasingly higher percentages of their losses.

Utilizing data from Huuuge and Platform Providers—entities through which Class Members purchased chips to gamble in Huuuge's social casinos—the Court-approved Notice Plan has been successfully implemented. The reaction of the class to date has been exceptional: thousands of Class Members have already submitted claims and the claims deadline is still several weeks out. By contrast, no Class Members have requested exclusion or objected to the settlement. Given the life-changing relief afforded, this volume of claims is not surprising and is consistent with the projections made at preliminary approval. Participating Class Members stand to recover substantial portions of their losses, with those who have lost the most standing to recover more than half of their gambling losses. By way of example, Class Members with Lifetime Spend Amounts of $100 stand likely to recover $15-$30; Class Members with Lifetime Spend Amounts of $1,000 stand likely to recover $150-$390; Class Members with Lifetime Spend Amounts of $10,000 stand likely to recover $2,200-$5,900; and Class Members with Lifetime Spend Amounts of $100,000 stand likely to recover more than $50,000. Equally as important, the settlement requires Huuuge to provide addiction-related resources within its social casino games and to create and honor a self-exclusion policy like those at Washington brick-and-mortar casinos.

Given the novelty of Plaintiff's claim, Professor William B. Rubenstein (author of the

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

influential treatise *Newberg on Class Actions*) describes the recovery as an "astounding accomplishment" and calls the relief provided "historic." And although there are no truly comparable settlements, the closest factual analogue pales in comparison to the relief afforded here. *See In re Apple In-App Purchase Litig.*, 5:11-CV-01758 EJD, 2013 WL 1856713 (N.D. Cal. May 2, 2013) (providing $5 to users of apps that compel children playing them to purchase large quantities" of in-game currency, "amounting to as much as $100 *per purchase* or more"). So, too, do typical consumer privacy class settlements, which often provide *cy pres* relief with no individual payments. *See In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 740 (9th Cir. 2017), *vacated on other grounds by Frank v. Gaos*, 139 S. Ct. 1041 (2019).

For the reasons that follow, this settlement is fair, reasonable, and adequate the Court should not hesitate to grant final approval.

## BACKGROUND

For the Court's convenience, the following "Background" section is included both in this motion and in the contemporaneously filed motion for attorney's fees, expenses, and incentive awards.

In 2014, Class Counsel began investigating the burgeoning social casino industry. *See* Declaration of Todd Logan ("Logan Decl.") ¶ 3. The results of that investigation were startling: multinational gambling corporations like Churchill Downs, International Game Technology, and Scientific Games had found a way to smuggle slot machines onto consumers' smart phones without complying with any federal or state gambling laws. *Id.* ¶ 4. By 2015, social casino games were capturing more than $3 billion in annual revenues.[1] Those revenues, just like those of Vegas casinos, were disproportionately derived from gambling addicts who just couldn't stop themselves from buying chips and spinning the slots. Moreover, those revenues—at least in Class Counsel's judgment—were entirely ill-gotten gains under a variety of state gambling laws. *See id.*

---

[1]    *See* Dean Takahashi, *13 predictions for the future of the $3.4B social casino games market*, GAMESBEAT (Oct. 19, 2015), *available at* https://bit.ly/2W83Yu3.

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1    Based on that investigation, in 2015 Class Counsel initiated a nationwide, multi-forum

2    campaign against the social casino industry. *See* Logan Decl. ¶ 5. As Professor William B.

3    Rubenstein, the sole author of NEWBERG ON CLASS ACTIONS, summarizes that campaign (and its

4    results):

> Prior to entering academia, I was a lawyer at the national office of the
> American Civil Liberties Union (ACLU) for nearly a decade, during which
> time I pursued civil rights campaigns on behalf of minority groups. Based
> on that experience, it strikes me that what Class Counsel have pursued here
> is closer in form to a civil rights litigation campaign than it is to a series of
> discrete class action settlements. Class Counsel saw an injustice – a thinly
> disguised form of gambling preying on those most vulnerable to addictive
> gambling – and they sought to fix it. Their goal was not to win a case but
> to reform an entire industry, much like a civil rights campaign might aim to
> reform a particular type of discriminatory practice across an entire
> employment sector. To accomplish this end, Class Counsel went far beyond
> what lawyers pursuing a simple class action case would normally do. Class
> Counsel pursued multiple cases. Class Counsel pursued multiple
> defendants. Class Counsel filed actions in multiple forums. Class Counsel
> tested various state laws. Class Counsel built websites to help app users
> avoid forced arbitration clauses, lobbied legislators and regulators, and took
> their efforts to the media. When Class Counsel lost, they did not give up,
> but changed tactics or forums and kept going. And they did all of this with
> their own funds, risking millions of dollars of their own money to end this
> practice. What they have achieved so far, with these initial settlements, is
> an astounding accomplishment that begins to chip away at the pernicious
> underlying social casinos.

17   Declaration of Professor William B. Rubenstein ("Rubenstein Decl.") ¶ 2.

18    Because the extraordinary settlement here is but a part of Class Counsel's efforts carrying

19   the banner nationwide for victims of the social casino industry, a summary of Class Counsel's

20   efforts both before this Court and otherwise is provided below.

21   **I.    Class Counsel's 2015 Social Casino Lawsuits.**

22    Having concluded that social casinos constitute gambling, between April and October of

23   2015, Class Counsel filed five (5) proposed class action lawsuits, in four (4) different courts,

24   alleging class claims under five (5) different sets of state gambling laws. *See* **(1)** *Mason v. Mach.*

25   *Zone, Inc.*, No. 15-cv-01107 (D. Md. Apr. 17, 2015) (alleging claims under California and

26   Illinois gambling laws); **(2)** *Kater v. Churchill Downs Inc.*, No. 15-cv-612 (W.D. Wash. Apr. 17,

27   2015) (alleging claims under Washington gambling law); **(3)** *Dupee v. Playtika Santa Monica, et*

1    *al.*, No. 15-cv-01021 (N.D. Ohio May 21, 2015) (alleging claims under Ohio and Nevada

2    gambling laws); **(4)** *Phillips v. Double Down Interactive LLC*, No. 15-cv-04301 (N.D. Ill.)

3    (removed May 14, 2015) (alleging claims under Illinois gambling laws); **(5)** *Ristic v. Mach.*

4    *Zone, Inc.*, No. 15-cv-08996 (N.D. Ill. Oct. 9, 2015) (alleging claims under Illinois gambling

5    laws).

6          Each federal district court initially presented with Class Counsel's theory of these

7    cases—*i.e.*, that social casinos are illegal gambling and consequently must return to consumers

8    their ill-gotten gains—squarely rejected it. *See Mason v. Mach. Zone, Inc.*, 851 F.3d 315, 316

9    (4th Cir. 2017); *Kater v. Churchill Downs Inc.*, No. 15-cv-612 MJP, 2015 WL 9839755, at *3

10   (W.D. Wash. Nov. 19, 2015), *rev'd*, 886 F.3d 784 (9th Cir. 2018); *Dupee v. Playtika Santa*

11   *Monica*, No. 15-cv-1021, 2016 WL 795857, at *1 (N.D. Ohio Mar. 1, 2016); *Phillips v. Double*

12   *Down Interactive LLC*, 173 F. Supp. 3d 731, 739 (N.D. Ill. 2016); *Ristic v. Mach. Zone, Inc.*, No.

13   15-cv-8996, 2016 WL 4987943, at *4 (N.D. Ill. Sept. 19, 2016). In representative fashion, Judge

14   Pechman's dismissal order in *Kater* concluded that "Big Fish Casino does not award something

15   of value satisfying the requisite prize element, and therefore the game is not 'illegal gambling'

16   under Washington law." *Kater*, 2015 WL 9839755, at *4.

17   **II.    Class Counsel Appeals The *Kater* Dismissal And The Ninth Circuit Reverses.**

18         Following Judge Pechman's dismissal order in *Kater*, Class Counsel appealed. Merits

19   briefing before the Ninth Circuit concluded in September 2016, and oral argument was held in

20   February 2018. In March 2018, the Ninth Circuit reversed:

21         In this appeal, we consider whether the virtual game platform "Big Fish
           Casino" constitutes illegal gambling under Washington law. Defendant-
22         Appellee Churchill Downs, the game's owner and operator, has made
           millions of dollars off of Big Fish Casino. However, despite collecting
23         millions in revenue, Churchill Downs, like Captain Renault in *Casablanca*,
           purports to be shocked—shocked!—to find that Big Fish Casino could
24         constitute illegal gambling. We are not. We therefore reverse the district
           court and hold that because Big Fish Casino's virtual chips are a "thing of
25         value," Big Fish Casino constitutes illegal gambling under Washington law.

26   *Kater*, 886 F.3d at 785. In that opinion, the Ninth Circuit dispensed with a variety of the

27   arguments that had persuaded district courts nationwide to initially dismiss the social casino

Motion for Final Approval
Case No. 18-cv-5276-RSL - 4

**Edelson PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

cases. For example, the Court rejected the argument that social casino chips "do not extend gameplay, but only enhance it." *Id.* at 787. The Circuit also rejected Big Fish's argument that the Washington State Gambling Commission ("WSGC" or "Commission") had determined that social casino games aren't gambling, concluding that "these documents do not indicate that the Commission adopted a formal position on social gaming platforms." *Id.* at 788. And the Ninth Circuit explicitly rejected "the reasoning of other federal courts that have held that certain 'free to play' games are not illegal gambling." *Id.*

**III.    Class Counsel's Post-Appeal Litigation Conduct Before This Court.**

Soon after remand in *Kater*, Class Counsel filed this proposed class action lawsuit on behalf of Plaintiff Sean Wilson alleging that, like Big Fish Casino, Defendant's social casino games—including "Huuuge Casino," "Billionaire Casino," and "Stars Casino" (together, the "Applications")—constitute unlawful gambling under Washington's gambling laws. *See* Dkt. 1.

In July 2018, Huuuge moved to compel arbitration, arguing that Wilson agreed to Huuuge's Terms of Use when he downloaded its app and played its games, and thereby waived his right to pursue relief through a class action. *See* Dkt. 31. Wilson opposed the motion, arguing that Huuuge had not put him on notice of Huuuge's Terms and thus he could not be bound by them. *See* Dkt. 35. The Court sided with Wilson in a November 2018 opinion and denied Huuuge's motion to compel arbitration. *See Wilson v. Huuuge, Inc.*, 351 F. Supp. 3d 1308, 1315–17 (W.D. Wash. 2018). Huuuge timely appealed and successfully moved for a stay pending appeal. *See* Dkts. 47, 49.

In December 2019, the Ninth Circuit reversed. *See Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1213 (9th Cir. 2019). The "question of first impression," the Circuit explained, was "under what circumstances does the download or use of a mobile application ("app") by a smartphone user establish constructive notice of the app's terms and conditions." Class Counsel had argued in its briefs and at oral argument that Huuuge's terms "were not conspicuous when [plaintiff] downloaded the app or during gameplay," *id.* at 1219, and the Circuit agreed:

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

> When downloading the app, the Terms are not just submerged—they are buried twenty thousand leagues under the sea. Nowhere in the opening profile page is there a reference to the Terms. To find a reference, a user would need to click on an ambiguous button to see the app's full profile page and scroll through multiple screen-lengths of similar-looking paragraphs. Once the user unearths the paragraph referencing the Terms, the page does not even inform the user that he will be bound by those terms. There is no box for the user to click to assent to the Terms. Instead, the user is urged to read the Terms—a plea undercut by Huuuge's failure to hyperlink the Terms. This is the equivalent to admonishing a child to "please eat your peas" only to then hide the peas. A reasonably prudent user cannot be expected to scrutinize the app's profile page with a fine-tooth comb for the Terms.

*Id.* at 1221. The Court also embraced Class Counsel's arguments that accessing the terms during gameplay was a "hide-the-ball" exercise and that Plaintiff's repeated use of the app had no bearing on the question of constructive notice. *Id.* Because "instead of requiring a user to affirmatively assent, Huuuge chose to gamble on whether its users would have notice of its Terms," the Ninth Circuit affirmed the district court's denial of Huuuge's motion to compel arbitration. *Id.*

Soon after remand, in March 2020—as the novel coronavirus tore through Washington state—Huuuge inserted a pop-up window into its Apps, preventing users from accessing their previously purchased chips unless they clicked a button purporting to indicate agreement to Huuuge's revised Terms of Use, including a "Governing Law and Binding Arbitration" ("GLBA") provision. *See* Dkt. 69. Wilson filed a motion for a temporary restraining order, seeking to have the pop-up window removed, *id.*, but the Court denied that motion, *see* Dkt. 82.

Separately, after unsuccessful negotiations regarding the scope of third-party discovery, Wilson subpoenaed Apple, Google, and Facebook in an effort to obtain information related to the proposed Class's virtual chip purchases. *See* Dkt. 85. Huuuge responded by filing a motion for a protective order, seeking to quash Wilson's third-party subpoenas. *See* Dkt. 88.

While that motion practice was pending, the Parties agreed in May 2020 to attend mediation with Judge Phillips (ret.) of Phillips ADR to attempt to resolve the case. The Parties began near-daily communication with each other and with the Phillips ADR team in order to narrow and crystallize the issues to be mediated. During this period, Huuuge provided Wilson

with detailed transactional data, the Parties exchanged substantive briefing on the core facts,

legal issues, litigation risks, and potential settlement structures, and the Parties supplemented that

briefing with extensive written and telephonic correspondence with each other and the Phillips

ADR team to clarify each party's positions. After a full-day mediation session on June 15, 2020,

Wilson made a "last, best, and final" demand set to expire the following day at noon. Huuuge

accepted that demand on June 16, 2020.

But the negotiations did not end there. The Parties worked over the next two months to

iron out the details of a final and binding class action settlement agreement. They exchanged

several rounds of edits on a settlement document and supporting exhibits, met and conferred

telephonically to discuss disputed provisions, and heavily negotiated the form and substance of a

notice and administration plan. On August 21, 2020, the Parties completed execution of the Class

Action Settlement Agreement. Wilson moved for preliminary approval on August 23, 2020, *see*

Dkt. 98, and the Court granted preliminary approval on August 31, 2020, *see* Dkt. 101.

**IV.    Class Counsel's Litigation-Adjacent Efforts On Behalf Of The Class.**

As a necessary extension of the traditional litigation work necessitated by these cases,

Class Counsel has for years undertaken all manner of litigation-adjacent work for the benefit of

the Class. These efforts are organized into three categories and summarized below.

*First*, Class Counsel went great lengths to protect this litigation from collateral

administrative attacks. Just two weeks after the Ninth Circuit's mandate issued in *Kater*,

Defendant's industry peers dispatched their litigation attorneys to the WSGC's session in

Tacoma to present a "Petition for a Declaratory Order" asking the Commission to declare that

other social casino games "do not constitute gambling within the meaning of the Washington

Gambling Act, RCW 9.46.0237." *Kater*, No. 15-cv-612, Dkt. 79-5 at 10. At each of the three

public hearings that followed—in July 2018 (in Tacoma) (a hearing in which Huuuge's counsel

from Davis Wright Tremaine appeared on behalf of another social casino company), August

2018 (in Pasco), and October 2018 (in Olympia)—Class Counsel appeared before the

Commission, and Class Counsel presented live argument at both the Tacoma and Pasco hearings.

*See* Logan Decl. ¶ 10. Class Counsel supplemented these appearances with a formal letter to the Commission (ahead of the Tacoma hearing) and, on the Commission's request, with an eighteen-page comment for the Commission's consideration (between the Tacoma and Pasco hearings). *Id.* The WSGC ultimately declined to enter a Declaratory Order. *See Kater*, No. 15-cv-612, Dkt. 74-1. And even after the initial declaratory order proceedings, Class Counsel continued to represent the interests of the consumers in additional flare-ups before the WSGC, including in similar declaratory order proceedings initiated by The Stars Group. *See* Logan Decl. ¶ 11.

*Second*, Class Counsel has been the frontline opposition to the social casino industry's attempt to change Washington's gambling laws. Starting in early 2019, the International Social Gaming Association ("ISGA") provided legislators draft legislation that would amend Washington's gambling statutes with the effect (and specific intent) of gutting these lawsuits. *See id.* ¶ 12. Over time, these efforts gained steam, with Senators Mark Mullet and John Braun, as well as Representatives Zack Hudgins, Brandon Vick, Bill Jenkin and Brian Blake, collectively sponsoring four (4) bills threatening to kill these cases by "clarifying" that players who lose money playing social casinos cannot recover under Washington's "Return of Money Lost at Gambling" statute ("RMLGA"). H.B. 2720, 66th Leg., Reg. Sess. (Wash. 2020); S.B. 6568, 66th Leg., Reg. Sess. (Wash. 2020); H.B. 2041, 66th Leg., Reg Sess. (Wash. 2019); S.B. 5886, 66th Leg., Reg. Sess. (Wash. 2019). Local and national media covered these efforts and left no doubt as to what the ISGA hoped to accomplish. *See, e.g.*, Phillip Conneller, *Washington State Social Gaming Legislation Could Rescue Big Fish Casino From Legal Trouble*, CASINO.ORG (Jan. 29, 2020), *available at* https://bit.ly/39dKtWM.

In response, Class Counsel engaged the lobbying firm Peggen & Mara Political Consulting LLP—experts in Washington tribal and gambling laws—to help Class Counsel (i) stay on top of all administrative and legislative developments in the Washington gaming industry; (ii) understand the intricacies of Washington's specific legislative process, including the nuances of—and procedures for—bill drafting; (iii) understand who the relevant lawmakers and stakeholders in Washington's gaming industry were, what those lawmakers and stakeholders

cared about, and how Class Counsel could educate those lawmakers and stakeholders about

social casinos; and (iv) work with legislative groups, task forces, and other interested parties in

in Washington's gaming industry, including the Washington Indian Gaming Association

("WIGA"). *See* Logan Decl. ¶ 13.

Class Counsel then used this information and expertise to amplify the Class's interests

and concerns. Class Counsel drafted memos and prepared handouts for a variety of stakeholders,

including State Senators and Representatives, the WIGA, the Washington Trial Attorneys'

Association, the Public Interest Research Group, and other organizations dedicated to remedying

problem gambling. *See id.* ¶ 14.

Class Counsel also personally met with lawmakers in the Washington Senate and House,

met with officials in the Executive branch, and provided in-person testimony to the Washington

Legislature. *See id.* ¶ 15. For example, in January 2019—after Class Counsel got wind that the

ISGA was planning to gut Washington's gambling statutes (in what would become the failed

H.B. 2041 and S.B. 5886)—Class Counsel met in-person with Representative Shelley Kloba,

then-Representative (and now Senator) Derek Stanford, Lieutenant Governor Cyrus Habib, and

several other government officials. *See id.* ¶ 16. On January 28, 2020, Class Counsel met with

Senator Stanford at the State Capital—following Class Counsel's written and in-person

testimony before the House Civil Rights & Judiciary Committee in (successful) opposition to

H.B. 2720. *See id.* ¶ 17.

Class Counsel's efforts went beyond in-person testimony and meetings with legislative

and executive officials. On March 21, 2019, Class Counsel sent formal correspondence to

Senator Mark Mullet ahead of a planned work session before the Senate and Financial

Institutions, Economic and Trade Committee about social casinos—in which Defendant's

industry peers had been invited, but Class Counsel had not. *See id.* ¶ 18. In August 2019, Class

Counsel travelled to Anacortes—on Swinomish Tribe land—to speak at a monthly WIGA

meeting, in opposition to the ISGA-backed bills. *See id.* ¶ 19. And in early 2020, Class Counsel

coordinated the submission of more than 200 letters to Washington State Representatives from

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

Big Fish Casino players across the country and spoke with local press about the ISGA's renewed efforts to gut these lawsuits. *See id.* ¶ 20; *see also* Melissa Santos, *'Free' casino apps prey on addiction, users say, and WA lawmakers are considering a crackdown*, CROSSCUT (Feb. 7, 2020), https://bit.ly/3hfFxDl. These efforts held the line. Each bill introduced over the past two years has stalled.

  *Third*, beyond Class Counsel's work on legislative and administrative fronts, Class Counsel also helped its clients sound the alarm on social casinos to the public at large by helping clients share their stories with local and national media, including in the following pieces:

- *Harpooned by Facebook*, REVEAL (Aug. 3, 2019), https://bit.ly/39NIdri (featuring radio interview with Class Counsel's client)

- Nate Halverson, *How social casinos leverage Facebook user data to target vulnerable gamblers*, PBS NEWSHOUR (Aug. 13, 2019), https://to.pbs.org/3lPRd1m (featuring television interview with Class Counsel's client)

- Melissa Santos, *'Free' casino apps prey on addiction, users say, and WA lawmakers are considering a crackdown*, CROSSCUT (Feb. 7, 2020), https://bit.ly/3qBBd6M (featuring Class Counsel's clients and Class Counsel Alexander Tievsky)

- Cyrus Farivar, *Addicted to losing: How casino-like apps have drained people of millions*, NBC NEWS (Sept. 14, 2020), https://nbcnews.to/39Lo1X1

## V. The Settlement Now Before The Court.

  Following all of these efforts, and with the assistance of the mediator, Judge Phillips, Class Counsel reached a settlement with Huuuge that provides a non-reversionary cash recovery of $6.5 million from which every Class Member who has ever lost money playing Defendant's social casino games is entitled to recover a substantial portion of their losses back. *See* Dkt. 99-1 § 1.32 (the "Agreement"). As described in the Plan of Allocation, attached to the Agreement as Exhibit E, the amount of each Settlement Class Member's payment will depend first on whether or not the Settlement Class Member is "potentially subject to Huuuge's Governing Law and

1  Binding Arbitration provision." *Id.* §§ 1.36, 2.1(c), (d); *id.* at ECF No. 55-56 (Exhibit E). Class

2  Members with higher levels of losses are entitled to recover increasingly higher percentages of

3  their losses, and the upper echelons of "VIP" players stand to recover more than half of their

4  losses. *See id.* § 1.36; *id.* § 2.1(c) ("The Settlement Payments for Non-GLBA and GLBA Claims

5  are each paid according to escalating marginal recovery percentages."). The Settlement also

6  requires Huuuge to implement meaningful prospective relief, including by providing addiction-

7  related resources within its social casino games and by creating and honoring a self-exclusion

8  policy akin to what one might expect to soon see at the Emerald Queen or the Muckleshoot

9  casinos. *See id.* § 2.2.

10  **THE TERMS OF THE SETTLEMENT AGREEMENT**

11  For the Court's convenience, the key terms of the Agreement are briefly summarized as

12  follows:

13  **A.    Settlement Class Definition:** The Settlement Class is defined as follows:

14  "Washington residents (as reasonably determined by IP address information or other information

15  furnished by Platform Providers) who played the Applications on or before preliminary approval

16  of the settlement."[2] *See* Agreement § 1.33.

17  **B.    Monetary Benefits:** Defendant has agreed to establish a $6,500,000.00

18  Settlement Fund from which Settlement Class Members who file valid claims will be entitled to

19  recover cash payments, after deducting costs and administrative expenses, any fee award to Class

20  Counsel, and any incentive payments to the Class Representatives. *See id.* § 1.32. No portion of

21  the Settlement Fund will revert to Defendant. *Id.* § 2.1(j). Any Settlement Class Member checks

22  not cashed within 90 days of issuance will either be placed in a second distribution fund or

23  donated to a Court-approved *cy pres* recipient. *Id.* § 2.1(i)*.* As described in detail in the Plan of

24

25  ─────────────
[2]      Excluded from the Settlement Class are (1) any Judge or Magistrate presiding over this action and members

26  of their families, (2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any
entity in which the Defendant or its parents have a controlling interest and their current or former officers, directors,

27  and employees, (3) persons who properly execute and file a timely request for exclusion from the class, and (4) the
legal representatives, successors or assigns of any such excluded persons. *See* Agreement § 1.33.

Allocation, the amount of each Settlement Class Member's payment will depend first on whether or not the Settlement Class Member is "potentially subject to Huuuge's Governing Law and Binding Arbitration provision." *See id.* §§ 1.36, 2.1(c), (d); Exhibit E. Recovery will vary from the baselines established by GLBA status according to the Settlement Class Member's Lifetime Spending Amount (those with higher Lifetime Spending Amounts are eligible to recover a greater percentage back) and overall Settlement Class Member participation levels. *See id.*

Based on its experience and on its estimated claims filing rates in this case, Angeion Group (the "Settlement Administrator") anticipates that participating Settlement Class Members with Lifetime Spending Amounts of $100 would likely recover $15-$30; Class Members with Lifetime Spending Amounts of $1,000 would likely recover $150-$390; Class Members with Lifetime Spending Amounts of $10,000 would likely recover $2,200-$5,900; and Class Members with Lifetime Spending Amounts of $100,000 would likely recover more than $50,000. *See* Declaration of Steven Weisbrot ("Weisbrot Decl.") ¶ 41. Though the claims period is still ongoing, Angeion stands by these estimates and projections. *Id.* Settlement Class Members are able to quickly and easily estimate the amount of their potential payment on the Settlement Website. *See* Agreement § 4.2(c).

C. **Prospective Relief:** For Applications Huuuge continues to offer to Washington residents (as determined by IP address or geolocations), Huuuge has agreed to establish a voluntary self-exclusion policy that will allow players to exclude themselves from further gameplay. *See id.* § 2.2. Huuuge must also make a link to that policy prominently available within the games, and its customer service representatives will provide the link to players who contact them and reference or seek help for video game behavior disorders. *See id.* Huuuge has also agreed to other prospective relief measures, including changes to game mechanics such that when players run out of virtual chips, they won't need to purchase additional chips or wait to receive free additional chips to continue playing at least one game within the Application they are playing. *See id.*

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

1    **D.**    **Release:** In exchange for the relief described above, Defendant and other entities,

2    including the Platform Providers Facebook, Apple, Google, and Amazon will be released from

3    all claims raised in these cases relating to the operation of Defendant's social casino games and

4    the sale of virtual chips in those games, including claims that the games were illegal gambling or

5    the chips were "things of value." The full release is contained at *id.* § 1.27.

6    **E.**    **Attorneys' Fees and Expenses Requests & Incentive Award Requests:**

7    Contemporaneously with the filing of this motion, Class Counsel are filing a motion for

8    attorneys' fees, expenses, and incentive awards.

9                                        **ARGUMENT**

10   **I.**    **The Court Need Not Revisit Class Certification.**

11   A threshold inquiry at final approval is whether the Class satisfies the requirements of

12   Federal Rule of Civil Procedure 23(a) and (b). *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

13   1019-1022 (9th Cir. 1998). Because no relevant facts have changed since the Court conditionally

14   certified the Settlement Class, Dkt. 101, the Court need not revisit class certification here. *See,*

15   *e.g.*, *Aikens v. Panatte, LLC*, No. 2:17-cv-01519, Dkt. 54 (W.D. Wash. Feb 5, 2019) (Lasnik, J.).

16   **II.**    **Notice Was Successful And Satisfied Due Process.**

17   Prior to granting final approval to this Settlement, the Court must consider whether the

18   Class Members received "the best notice that is practicable under the circumstances, including

19   individual notice to all members who can be identified through reasonable effort." Fed. R. Civ.

20   P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). "The rule does

21   not insist on actual notice to all class members in all cases." *Mullins v Direct Digital LLC*, 795

22   F.3d 654, 665 (7th Cir. 2015); *see also Juris v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir.

23   2012) (noting that "even in Rule 23(b)(3) class actions, due process does not require that class

24   members actually receive notice" and collecting cases). Although what constitutes the "best

25   notice practicable" is case-specific, the Federal Judicial Center has noted that a notice campaign

26   that reaches 70% of a class is often reasonable. Federal Judicial Center, *Judges' Class Action*

27

1  *Notice & Claims Process Checklist & Plain Language Guide*, at 3 (2010), *available at*

2  https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf.

3          The Court already provisionally approved the Notice Plan proposed by the Class

4  Representatives and Class Counsel. Dkt. 101 at 5-6. That plan utilized both direct and

5  publication notice to the Settlement Class. *Id.* To provide direct notice to all who were eligible to

6  submit a claim for payment from the Settlement, Class Counsel worked with Counsel for

7  Defendant and also subpoenaed a variety of third parties to obtain contact information for

8  everyone with a Lifetime Spending Amount of greater than zero (*i.e.*, those who are entitled to

9  make a claim against the Settlement Fund). *See generally* Weisbrot Decl. As the Court is well

10  aware, this was not an easy process. Class Counsel engaged in extensive negotiations with the

11  Platform Providers. *See* Dkt. 108 at 1 (describing Class Counsel's work to subpoena six

12  technology platforms, engage in dozens of telephonic meet and confers, and reach agreements

13  with the platforms). Apple, Amazon, Google, and Facebook ultimately provided Class Counsel

14  with sufficient data to effectuate the Notice Plan. *See* Weisbrot Decl. ¶¶ 5-6, 17, 20, 24.

15          Once that data was collected, it was transmitted to Angeion Group, the Settlement

16  Administrator, to compile a complete Class List. The Defendant, Google, and Facebook

17  ultimately provided Angeion with contact information for approximately 29,000 accounts. *See*

18  *id.* ¶¶ 4-6. Once duplicate emails were removed, Angeion created a notice list of 28,896 emails.

19  *See id.* ¶ 9. Angeion sent out multiple rounds of email notice. In the first round (which did not

20  include Settlement Class Members whose information was provided by Apple or Amazon, given

21  the timing of their productions), 28,658 emails were successfully delivered on November 9,

22  2020. *See id.* ¶ 10. A small percentage of the emails sent in this round were not delivered due to

23  a hard bounce (a permanent deliverability problem) or a soft bounce (a temporary deliverability

24  problem). *See id.* ¶¶ 10-11. On November 25, 2020, the email notice was successfully delivered

25  to 10,569 email addresses provided by Apple. *See id.* ¶ 18. On December 4, 2020, the email

26  notice was successfully delivered to 1,669 email addresses provided by Amazon. *See id.* ¶ 22.

27

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

All told, email notice was successfully delivered to approximately 97.98% of the email addresses obtained by Angeion. *See* Weisbrot Decl. ¶¶ 10, 18, 22.

On December 4, 2020, Angeion also sent a reminder notice to 28,614 email addresses (those associated with an account that had not yet submitted a claim); 28,366 (or 99%) of those were successfully delivered. *See id.* ¶ 25.

Additionally, using the information provided by Defendant and the Platforms, Angeion performed a "reverse look-up" to find mailing information for every account with at least $100 in Lifetime Spending Amount. *See id.* ¶¶ 7-8, 21. That analysis yielded 2,784 postal addresses. *See id.* ¶ 9. Angeion ran each of these addresses through the USPS National Change of Address Database and then sent postcard notice to each of these individuals via First Class U.S. Mail on November 9, 2020. *See id.* ¶¶ 13-15; *id.* at Ex. B. After Angeion received additional information from Apple, Angeion sent postcard notice to 2,332 individuals on December 2, 2020; after it received additional information from Amazon, Angeion sent postcard notice to 288 Class Members on December 4, 2020. *See id.* ¶¶ 19, 23. All told, Angeion sent postcard notice to 5,404 addresses.

As of December 9, 2020, 64 Postcard Notices were returned by the USPS without a forwarding address. *id.* ¶ 16. Angeion conducted address verification searches ("skip traces") in an attempt to locate updated addresses. *Id.* Angeion identified 64 updated addresses via skip tracing and updated its database with the new addresses to be remailed. *Id.*

Direct notice was supplemented by online publication notice in the form of digital advertisements targeted to be seen by individuals most likely to be part of the Settlement Class. Starting on November 10, 2020, the Settlement was listed and promoted through two leading class action settlement websites, www.topclassactions.com and www.classaction.org. *See id.* ¶ 32. Angeion also caused a press release detailing the Settlement to be issued via PR Newswire on November 17, 2020. *See id.* ¶ 34. As of December 9, 2020, a total of 1,000 news outlets picked up the notice of the Settlement from the press release, for a potential audience of approximately 93,000. *Id.* Beginning on November 9, 2020, Angeion also posted advertisements

about the Settlement on Facebook and promoted the Settlement on Twitter; these ads are scheduled to run for 60 consecutive days. *Id.* ¶ 36. As of December 9, 2020, approximately 4,947,886 Facebook Ad impressions have been served. *Id.* Starting on November 9, 2020, Angeion also caused targeted paid display ads ("Banner Ads") to be displayed on websites that Settlement Class Members are likely to visit; these ads are scheduled to run for 60 consecutive days. *Id.* ¶ 38. As of December 9, 2020, approximately 8,497,393 Banner Ad impressions have been served. *Id.*

Angeion also established a toll-free hotline on September 9, 2020 that provides Settlement Class Members with responses to frequently asked questions and informs them of important dates and deadlines pertaining to the Settlement. *Id.* ¶¶ 29-30. As of December 9, 2020, the toll-free hotline has received 114 calls. *Id.* ¶ 31.

Finally, all forms of notice accurately described the Settlement and directed the recipient to the Settlement Website, where Class Members can review the plan of allocation, use a slider tool to estimate in real time how much of their losses they are projected to recover through the Settlement, and file a claim. *See* Agreement § 4.2(c); Dkt. 98 at 23.

This all confirms what the Court already provisionally found: the Notice Plan here constituted the "best practicable notice" under the circumstances, and was reasonably calculated to apprise interested Settlement Class Members of their rights under the Settlement. *See* Dkt. 101 at 5. There have been no major issues noticing the Settlement Class. Direct email notice was successfully delivered to approximately 97.98% of the email addresses obtained by Angeion. *See* Weisbrot Decl. ¶¶ 10, 18, 22. Further, the digital notice program is on track to reach approximately 75.29% of the Target Audience, with an average frequency of 3.97, as it was designed to do (*i.e.*, 75.29% of the Target Audience will see a digital advertisement concerning the Settlement an average of 3.97 times each). Weisbrot Decl. ¶ 43; *see also* Dkt. 100 at 6. Preliminary figures confirm the estimates provided to the Court at preliminary approval regarding notice, and the Court should therefore find that the Notice Plan ultimately complied with Due Process.

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1  **III.    The Court Should Finally Approve The Settlement.**

2          To approve the settlement of a class action as fair, reasonable, and adequate, Rule 23(e)

3  requires Court to consider "whether (A) the class representatives and class counsel have

4  adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief

5  provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and

6  appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including

7  the method of processing class-member claims; (iii) the terms of any proposed award of

8  attorney's fees, including timing of payment; and (iv) any agreement required to be identified

9  under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other."

10  These factors largely encompass those identified by the Ninth Circuit for evaluating a class

11  settlement. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)

12  (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

13          The Committee Notes to the recent revision of Rule 23 make clear that the newly

14  enumerated factors were not intended to replace approval factors already used in courts around

15  the country, but "rather to focus the court and the lawyers on the core concerns of procedure and

16  substance that should guide the decision whether to approve the proposal." Thus, courts examine

17  the new Rule 23 factors alongside the traditional *Churchill* factors relevant to the particular case,

18  mindful that there is considerable overlap between the two. *See, e.g.*, *Walters v. Target Corp.*,

19  No. 16-cv-1678, 2020 WL 6277436, at *5 (S.D. Cal. Oct. 26, 2020).[3]

20
21          **A.    Class Counsel and the Class Representatives have adequately represented
          the Class and support the Settlement.**

22          Class Counsel's representation of the Class' interests here was not just adequate; it was

23  extraordinary. Class Counsel filed this case, in 2018, after obtaining a landmark Ninth Circuit

24  ruling in the related *Kater* matter. From the get-go, Class Counsel had to defend Washington's

25  gambling laws from repeated attacks both in the WSGC and in the Washington State Legislature.

26  ───────────────

27  [3]        There is no governmental participant here, so that factor is neutral. Further, to date, there are no agreements
that must be identified under Rule 23(e)(3), nor do counsel anticipate reaching any such agreements.

At the same time, Class Counsel successfully defended against Huuuge's efforts to force the case to arbitration, both at the district court and in front of the Ninth Circuit. Those efforts led to a precedential victory for consumers on a "question of first impression" regarding constructive notice of terms and conditions in smartphone applications. *See Huuuge, Inc.*, 944 F.3d at 1213. Following their appellate win, Class Counsel pursued an aggressive third-party discovery strategy that prompted successful settlement discussions. *Compare* Dkt. 85 (May 14, 2020); Dkt. 92 (June 17, 2020). All of these efforts demonstrate that Class Counsel provided more than adequate service to the Class in this case.

Class Representatives Wilson and Hammer likewise adequately represented the Class. Wilson remained in regular communication with Class Counsel, timely responded to requests for information, closely reviewed papers, closely reviewed the terms of the Settlement, discussed the Settlement with Class Counsel, and signed the Settlement because he believes it is fair and in the best interests of the Class. *See* Declaration of Sean Wilson ("Wilson Decl.") ¶ 5. Hammer also reviewed the terms of the Settlement, discussed it with Class Counsel, and signed it because she believes it is fair and in the best interests of the Class. Declaration of Heidi Hammer ("Hammer Decl.") ¶ 3. Their services were more than adequate.

The Court may also consider Class Counsel's support of the Settlement which also favors approval. *In re Bluetooth*, 654 F.3d at 946. It is well-established that "the recommendations of plaintiff['s] counsel should be given a presumption of reasonableness." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (quotations omitted). Class Counsel here have extensive experience prosecuting these types of claims, and it is their considered judgment that this Settlement represents an outstanding result for the Settlement Class.

## B.     The Settlement was negotiated at arm's length.

It is beyond cavil that the Settlement here was negotiated at arm's length, and was the product of non-collusive negotiations—as the Court has already preliminarily found. *See* Dkt. 101 at 4. Class Counsel and defense counsel sparred over, among other things, arbitration and a temporary restraining order during the litigation, and the eventual Settlement was reached only

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

after an intense mediation process that involved weeks of near-daily communication to narrow

and crystallize the issues, a full-day mediation session in June 2020 with Judge Phillips (ret.) of

Phillips ADR, and then two months of further negotiations to iron out the details of a final and

binding class action settlement agreement. This process supports a finding that there was no

collusion here. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a

good deal of stock in the product of an arms-length, non-collusive, negotiated resolution.");

*Helde v. Knight Transp., Inc.*, No. 2:12-cv-00904 RSL, Dkt. 191 at 2 (W.D. Wash. May 24,

2017) (granting preliminary approval where "Settlement Agreement resulted from extensive

arm's-length negotiations, with participation of an experienced mediator"); *Gragg v. Orange

CAB Co., Inc.*, No. 12-cv-0576 RSL, 2017 WL 785170, at *1 (W.D. Wash. Mar. 1, 2017)

(same).

Moreover, this Settlement contains none of the red flags the Ninth Circuit has identified

as indicative of possible collusion: (1) "when counsel receive a disproportionate distribution of

the settlement, or when the class receives no monetary distribution but class counsel are amply

rewarded," (2) "when the parties negotiate a 'clear sailing' arrangement," and (3) "when the

parties arrange for fees not awarded to revert to defendants rather than be added to the class

fund." *In re Bluetooth*, 654 F.3d at 947 (quotations omitted). Class Counsel's fee will be

determined separately, but as explained in Class Counsel's fee petition, they seek a percentage

recovery that is consistent with Washington law and Ninth Circuit precedent, reflects their work

here, and is proportionate. Moreover, the Settlement does not contain a "clear sailing"

agreement; Defendant is free to object to Class Counsel's fee petition if they so desire.

Agreement § 9.1. And there is no reverter here: all Settlement funds will go to Class Members,

less Class Counsel's fees and any administrative costs. *Id.* § 1.35. This consideration clearly

supports final approval.

1

**C.      The amount offered in Settlement is adequate, taking into account the strength of Plaintiff's case, and the risks inherent in further litigation.**

2

3        Even before the revised Rule 23 highlighted that the Court should consider the amount

4    offered in settlement, courts recognized that the size of any settlement, compared to the

5    likelihood of full recovery, "is generally considered the most important" factor in evaluating a

6    settlement. *See Bayat v. Bank of the West*, No. 13-cv-2376, 2015 WL 1744342, at *4 (N.D. Cal.

7    Apr. 15, 2015). Here, an evaluation of the risks present in this litigation, combined with an

8    assessment of the scope of relief, shows that the Settlement easily qualifies as fair, reasonable,

9    and adequate.

10                  **i.      The Settlement Class would have faced significant delay before it could have recovered anything on the merits.**

11

12        To be frank, Class Counsel is confident in the merits of these cases. The key legal

13    questions, particularly under the RMLGA, are straightforward, and in Class Counsel's view,

14    have been conclusively answered by the Ninth Circuit's decision in the appeal in the *Kater*

15    matter. Nevertheless, the case presented some legal risks. For instance, the Davis Wright

16    Tremaine lawyers representing Huuuge in this case have argued in other cases that the regular

17    provision of free chips within social casinos means that the chips themselves are not "things of

18    value." *See, e.g.*, *Benson v. DoubleDown*, No. 18-cv-525, Dkt. 103 (W.D. Wash. June 17, 2020)

19    (seeking to certify issue to the Washington Supreme Court). Plaintiff, of course, disagrees, and

20    this Court has dismissed that contention at every turn, relying on the Ninth Circuit's decision in

21    *Kater*. But it is also true that the opinion in *Kater* specifically notes that the court did not

22    consider the defendants' specific arguments about the regular provision of free chips. *See* 886

23    F.3d at 787.

24        Moreover, as Plaintiff explained at preliminary approval, the principal risk here was

25    legislative—*i.e.*, the chance that social casino companies' efforts at changing the law, either

26    through the Washington legislature or the WSGC, would succeed before this matter reached

27    judgment, and leave Settlement Class Members with nothing. Plaintiff's counsel have thus far

1    fended off the ISGA's phalanx of well-heeled lobbyists, but the social casino companies and

2    their ISGA comrades are formidable opponents. If this case does not settle now, each legislative

3    cycle the Class will be at risk of having their claims eviscerated in the name of "remov[ing] . . .

4    economic uncertainty" by "clarifying" that proposed Class Members cannot recover under the

5    RMLGA. H.B. 2720, 66th Leg., Reg. Sess. (Wash. 2020).

6           This legislative risk is particularly acute here because it is practically inevitable that this

7    case would take years to reach judgment, particularly in light of the significant delays in civil

8    trials caused by the COVID-19 pandemic. At the time this case settled, the Parties had fully

9    briefed a number of contested discovery issues. There is every reason to believe that the Parties

10    would have continued to fight tooth and nail over every aspect of discovery had the case not

11    settled. Such discovery fights would inevitably prolong the discovery period here, after which

12    the Parties would heavily contest class certification and, perhaps, summary judgment, and then

13    trial. The history of the case so far, and Huuuge's appeal of the arbitration decision, also suggest

14    that any trial verdict was bound to be appealed, further lengthening the proceedings.

15           Courts have regularly recognized that the prospect of significant delay while a case works

16    its way to judgment is reason to favor immediate settlement. After all, one dollar today is worth

17    significantly more than one dollar three years from now. *Rodriguez*, 563 F.3d at 966 ("Inevitable

18    appeals would likely prolong the litigation, and any recovery by class members, for years. This

19    factor, too, favors the settlement."); *Ikuseghan v. Multicare Health Sys.*, No. 3:14-cv-05539

20    BHS, 2016 WL 3976569, at *4 (W.D. Wash. July 25, 2016) ("[T]he outcome of trial and any

21    appeals are inherently uncertain and involve significant delay. The Settlement avoids these

22    challenges."). But delay is especially problematic here. The longer the case survives, the more

23    opportunities Huuuge, social casino companies, and their allies would have to effect retroactive

24    change to the law.

25

26

27

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

1
ii.    **Given the risks involved with further litigation, the amount offered in Settlement is outstanding.**

2       The centerpiece of this Settlement is a $6.5 million non-reversionary common fund,

3   which will be used to help Settlement Class Members recoup their losses. This is an

4   exceptionally strong Settlement, both in terms of its size as compared to the size of the sole

5   Defendant and in terms of the individual cash relief it will afford to Class Members. It is a large

6   enough sum that Class Members with the largest Lifetime Spending Amounts stand to recover

7   more than 50% of their losses, and that no participating Class Member is likely to recover less

8   than 10% of their losses. *Cf.* Declaration of Steven Weisbrot ("Weisbrot Decl.") ¶ 41. More

9   specifically, the Settlement Administrator projects that Class Members with Lifetime Spend

10  Amounts of $100 would likely recover $15-$30; Class Members with Lifetime Spend Amounts

11  of $1,000 would likely recover $150-$390; Class Members with Lifetime Spend Amounts of

12  $10,000 would likely recover $2,200-$5,900; and Class Members with Lifetime Spend Amounts

13  of $100,000 would likely recover more than $50,000. *See* Weisbrot Decl. ¶ 41.

14      It is difficult to compare this recovery to the recovery provided for under other

15  comparable settlements, given that this case has no true peers to be reasonably measured against.

16  On the facts, the closest comparator is almost certainly *In re Apple In-App Purchase Litigation*,

17  in which the class alleged that certain apps offered within Apple's App Store were "highly

18  addictive, designed deliberately so, and tend to compel children playing them to purchase large

19  quantities" of in-game currency, "amounting to as much as $100 *per purchase* or more." No.

20  5:11-cv-01758 EJD, 2013 WL 1856713, at *1 (N.D. Cal. May 2, 2013) (emphasis added). But

21  there, the settlement established no common fund at all, the default recovery for participating

22  class members was five dollars (yes, $5), and with adequate proof some claiming class members

23  could claim refunds for a single 45-day period of purchases. *Id.* at *5. Similarly, in *Kim v.*

24  *Tinder, Inc.*, the class alleged unfair pricing with regard to in-app purchases in a popular dating

25  app. No. 18-cv-3093-JFW(ASX), 2019 WL 2576367, at *2 (C.D. Cal. June 19, 2019). The

26  settlement established no common fund at all, and participating class members received 50 free

27  "Super Likes" (*i.e.*, coupons) in addition to an option to select a $25 cash payment (as an

1   alternative to other coupon offers). *Id.* Without meaning to punch down, there is just no

2   comparison between the settlements that have ever previously been reached in factually similar

3   cases to the Settlement currently before the Court.

4          Perhaps the better measuring stick for this Settlement are class action settlements in the

5   consumer privacy space, given that those settlements often resolve large (statutory) damages

6   claims and are premised on novel interpretations of law as applied to allegations of internet-

7   based misconduct. Consumer privacy settlements, too, are notorious for failing to provide

8   consumers with real-world relief for the damages they have suffered. For example, *In re Google*

9   *Referrer Header Privacy Litig.*, 869 F.3d at 740, approved the settlement where all of the money

10  was to go to *cy pres*, with no cash relief for the class at all. *Gaos*, 139 S. Ct. at 1045. And even in

11  consumer privacy settlements that do provide monetary relief and have been adjudged to be fair

12  and reasonable by district courts, the relief is often primarily in-kind. *See, e.g.*, *In re Anthem, Inc.*

13  *Data Breach Litig.*, 327 F.R.D. 299, 324 (N.D. Cal. 2018) (explaining that less than 10% of the

14  "fund" was available for cash payments, with the rest being reserved to purchase credit

15  monitoring services); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-md-02752-

16  LHK, 2020 WL 4212811, at *22 (N.D. Cal. July 22, 2020) (cash relief made available only to

17  class members with existing credit monitoring, out-of-pocket losses, and who paid Yahoo! for

18  premium services).

19         And beyond the cash recovery, the Settlement provides for substantial non-monetary

20  benefits. The Settlement requires Huuuge to implement meaningful prospective relief, including

21  by providing addiction-related resources within its social casino games and by creating and

22  honoring a meaningful self-exclusion policy. *See* Agreement § 2.2. Given the fervor with which

23  Huuuge insisted that its games are not gambling, these in-game changes are a monumental

24  achievement for the Settlement Class. They represent, in conjunction with the changes required

25  by the settlements in two related cases, the first steps toward much-needed self-regulation within

26  the social casino industry.

27

Motion for Final Approval
CASE NO. 18-CV-5276-RSL - 23

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

1    In sum, the amount offered in the Settlement, when compared with the risks and expense

2   of further litigation, strongly supports final approval.

3    **D.    The Settlement Treats Settlement Class Members Equitably.**

4    The revised Rule 23 further asks courts to assess whether the proposed settlement "treats

5   class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). The Rule's revised

6   text makes clear that *equal* treatment is not required, but fair treatment is instead the goal. The

7   Settlement here achieves that goal.

8    As Class Counsel explained at preliminary approval, and as hashed out in detail in the

9   Plan of Allocation, a Settlement Class Member's total recovery will depend on the extent of their

10   losses (*i.e.*, those with greater losses will recover a higher proportion of their losses) and whether

11   the Settlement Class Member opted out of Huuuge's GLBA Provision after seeing the popup

12   displayed in March 2020. Dkt. 98 at 12-13; Agreement § 1.36, 2.1(c), (d). The Plan of Allocation

13   therefore distributes Settlement funds according to those who have suffered the greatest harm,

14   and those with the stronger legal claims.

15    Allocating settlement funds in this way achieves an equitable result. Settlement Class

16   Members with tens or hundreds of thousands of dollars in losses have frequently suffered serious

17   collateral harms, such as alienation from family or friends, or the accrual of huge debts, that were

18   not suffered by those who may have purchased $10 or $20 worth of chips. And even though all

19   Settlement Class Members have equally strong RMLGA claims, Settlement Class Members with

20   huge losses who accessed Defendant's VIP tiers and interacted with a VIP host may have a

21   stronger Consumer Protection Act claim to release here. Likewise, those who did not opt out of

22   Huuuge's purportedly mandatory GLBA Provision still have a strong RMLGA claim, and while

23   Class Counsel do not believe the provision is or was binding, if those Class Members had been

24   compelled to arbitration they could have seen their losses cut by, for instance, a provision in the

25   Terms of Use which purports to bind users to a shorter limitations period than is codified in

26   Washington law. As explained above, in Class Counsel's view, the Class stands largely on equal

27   footing. But a clear-eyed assessment of the risks that lie ahead demonstrates that certain claims

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1  are stronger than others, something appropriately reflected in the Plan of Allocation. *See In re*

2  *Equity Funding Corp. of Am. Securities Litig.*, 603 F.2d 1353, 1365 (9th Cir. 1979) (concluding

3  that the district court's approval of certain offsets "in [a] Plan of Allocation was a component of

4  its duty to insure the equitable distribution of the settlement proceeds"); 2 MCLAUGHLIN ON

5  CLASS ACTION § 6.23 (17th ed. 2020) ("Allocation formulas, including certain discounts for

6  certain types of claims within a class, may properly take into consideration the comparative

7  strengths and values of different categories of the settled and released claims.").

8      Likewise, the provision of service awards for the Class Representatives is consistent with

9  the equitable treatment of class members. Sean Wilson seeks an award of $10,000. This modest

10  award reflects his service to the Class. He put his name to a lawsuit that advanced a novel theory

11  and that ultimately allowed injured individuals to recoup thousands of dollars in losses. While

12  that is typical of class plaintiffs, the risk of reputational injury here is higher, given the subject

13  matter of the lawsuit. Wilson reviewed pleadings and other papers, communicated regularly with

14  Class Counsel, and participated in the settlement process. He estimates that he spent dozens of

15  hours in service to the Settlement Class. Similarly, the request for a $1,000 incentive award for

16  Heidi Hammer is appropriate and comports with equity, since Hammer expended time reviewing

17  the terms of the Settlement, and she stepped forward to share her approval of the Agreement with

18  the public, which helped demonstrate the Settlement's success. As explained in the separate

19  motion for attorney's fees, expenses, and incentive awards, these incentive awards are in line

20  with other awards given to class representatives, and fairly reflect Wilson's and Hammer's

21  service to the Settlement Class. Given that Wilson's and Hammer's efforts were key to ensuring

22  that the Settlement Class recovered anything, the modest proposed incentive awards are fully

23  consistent with equity.

24      In sum, the Settlement treats all Class Members equitably relative to each other,

25  supporting final approval.

26

27

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

**E.    Class Counsel Had Sufficient Information To Reach An Informed Judgment About The Benefits Of Settling, And The Quality Of The Settlement.**

Next, the Parties "had enough information to make an informed decision about the strength of their cases and the wisdom of settlement." *Rinky Dink, Inc. v. World Bus. Lenders, LLC*, No. 14-cv-0268, 2016 WL 4052588, at *5 (W.D. Wash. Feb. 3, 2016). The Parties only agreed to mediate after about two years of contentious of litigation, including briefing before this Court and before the Ninth Circuit. *See* Declaration of Todd Logan, Dkt. 99 ¶ 21. And while the Parties did not conduct a substantial volume of formal party discovery prior to mediation, the Parties exchanged significant information leading up to their mediation in June 2020, including detailed transactional data. *Id.* ¶ 7. The Parties also exchanged substantial briefing on the core facts, legal issues, litigation risks, and potential settlement structures; and the Parties supplemented that briefing with extensive written and telephonic correspondence, mediated and shuttled by the Phillips ADR team, clarifying each other's positions in advance of the mediation. *Id.* Only after of a full day of mediation on June 15, 2020, with the skilled assistance of Judge Phillips and his Phillips ADR team, were the Parties able to reach a settlement. *Id.* ¶ 8. By then, the Parties were fully informed on all pertinent issues and capable of assessing the benefits of the Settlement now before the Court. *Id.* ¶ 9; *Ikuseghan*, 2016 WL 3976569, at *3 (approving settlement reached "between experienced attorneys who are familiar . . . with the legal and factual issues of this case in particular"). This factor, too, thus supports final approval.

**F.    The Reaction Of The Settlement Class Has Been Favorable.**

Finally, current claim data indicates that the Class has responded favorably to the Settlement, warranting final approval. As of December 9, 2020, the Settlement Administrator has received 11,550 claims. Weisbrot Decl. ¶ 40. The Administrator has not received any requests for exclusion or been made aware of any objections, as of December 9, 2020. *Id.* ¶ 42. Such low opposition to the Settlement speaks volumes regarding the fairness and adequacy of the Settlement. Indeed, "[w]hen few class members object, a court may appropriately infer that a class action settlement is fair, adequate, and reasonable." *Schneider v. Wilcox Farms, Inc.*, No. 07-cv-01160-JLR, 2009 WL 10726662, at *3 (W.D. Wash. Jan. 12, 2009). Courts in this district

have found that class reaction supported final approval even with significantly higher exclusion and objections rates. *See Pelletz v. Weyerhouser Corp.*, 255 F.R.D. 537, 543-44 (W.D. Wash. 2009) (lauding "positive response" of Settlement Class of 110,000 to 140,000 members where 119 excluded themselves from the settlement, and 3 objected); *Clemans v. New Werner Co.*, No. 12-cv-5186, 2013 WL 12108739, at *5 (W.D. Wash. Nov. 22, 2013) (in settlement involving class of 300, one objection and four exclusions were filed, court found that "the overwhelming non-opposition to and participation in the Settlement [are] strong indications of Class Members' support for the Settlement as fair, adequate, and reasonable."); *see also Rodriguez*, 563 F.3d at 967 (9th Cir. 2009) (concluding that the district court "had discretion to find a favorable reaction" when 54 of 376,301 class members objected to settlement); *Churchill Vill.*, 361 F.3d at 577 (affirming approval of class-action settlement where 45 of 90,000 class members objected). Given the high participation rates here, and near total absence of any opposition to the Settlement, the Court should find that the reaction of the Settlement Class also favors final approval.[4]

## CONCLUSION

The Court should finally certify the Settlement Class and grant final approval to the instant Settlement.

Respectfully submitted,

December 14, 2020                    By:  /s/ Alexander G. Tievsky

Alexander G. Tievsky, WSBA #57125
atievsky@edelson.com
Edelson PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370/Fax: 312.589.6378

---

[4]     Consistent with the Court's order at Dkt. 105, Class Counsel intend to file a supplemental brief with final claims numbers and projected recoveries after the claims deadline and prior to the final fairness hearing.

By:  /s/ Todd Logan

Rafey S. Balabanian*
rbalabanian@edelson.com
Todd Logan*
tlogan@edelson.com
Brandt Silver-Korn*
bsilverkorn@edelson.com
Edelson PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300/Fax: 415.373.9435

By:  /s/ Cecily C. Shiel

TOUSLEY BRAIN STEPHENS PLLC
Cecily C. Shiel, WSBA #50061
cshiel@tousley.com
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600

*Plaintiff's Attorneys and Class Counsel*
*Admitted *pro hac vice*